UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DANIEL H.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02597-MJD-TWP |
| | ) | |
| KILOLO KIJAKAZI, Acting Commissioner of | ) | |
| the Social Security Administration,[2] | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Claimant Daniel H. applied for disability insurance benefits ("DIB") and supplemental

security income ("SSI") from the Social Security Administration ("SSA") on February 27, 2018,

alleging an onset date of June 19, 2017.  [Dkt. 12-2 at 16.]  His applications were initially denied

on May 24, 2018, [Dkt. 12-4 at 2; Dkt. 12-4 at 6], and upon reconsideration on September 11,

2018, [Dkt. 12-4 at 16; Dkt. 12-4 at 23].  Administrative Law Judge Roy E. LaRoche, Jr.,

conducted a hearing on November 27, 2019.  [Dkt. 12-2 at 34.]  The ALJ issued a decision on

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the
recommendation of the Court Administration and Case Management Committee of the
Administrative Office of the United States courts, the Southern District of Indiana has opted to
use only the first name and last initial of non-governmental parties in its Social Security judicial
review opinions.

[2] According to Federal Rule of Civil Procedure 25(d), after the removal of Andrew M. Saul from
his office as Commissioner of the SSA on July 9, 2021, Kilolo Kijakazi automatically became
the Defendant in this case when she was named as the Acting Commissioner of the SSA.

January 10, 2020, concluding that Claimant was not entitled to receive benefits.  [Dkt. 12-2 at 13.]  The Appeals Council denied review on August 13, 2020.  [Dkt. 12-2 at 2.]  On October 7, 2020, Claimant timely filed this civil action asking the Court to review the denial of benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  [Dkt. 1.]

## I.  STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019).  Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Stephens*, 888 F.3d at 327.  For the purpose of judicial review, "substantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154).  "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327.  Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)).  The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the

evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting

*Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

The SSA applies a five-step evaluation to determine whether the claimant is disabled.

*Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).  The

ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has
> a severe impairment; (3) whether the claimant's impairment meets or equals one
> of the impairments listed by the [Commissioner]; (4) whether the claimant can
> perform his past work; and (5) whether the claimant is capable of performing work
> in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations

omitted).[3]  "If a claimant satisfies steps one, two, and three, [he] will automatically be found

disabled.  If a claimant satisfies steps one and two, but not three, then [he] must satisfy step four.

Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable

of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.

1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual

functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable

impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir.

2009).  In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.*  The

ALJ uses the RFC at Step Four to determine whether the claimant can perform his own past

---

[3] The Code of Federal Regulations contains separate, parallel sections concerning DIB and SSI,
which are identical in most respects.  Cases may reference the section pertaining to DIB, such as
in *Clifford*, which cites 20 C.F.R. § 404.1520.  227 F.3d at 868.  Generally, a verbatim section
exists establishing the same legal point with both types of benefits.  *See, e.g.*, 20 C.F.R. §
416.920.  The Court will not usually reference the parallel section, but will detail any substantive
differences applicable to the case.

relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v). The burden of proof is on the claimant for Steps One through Four; only at Step Five does the burden shift to the Commissioner. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). "An award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Id.* (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

## II. <u>BACKGROUND</u>

Claimant was 49 years old at the time his alleged disability began. [*See* Dkt. 12-5 at 2.] He had earned a bachelor's degree in safety management. [Dkt. 12-2 at 37.] He had worked as a courier and delivery driver. [Dkt. 12-6 at 7.][4]

The ALJ followed the five-step sequential evaluation in 20 C.F.R. § 404.1520(a)(4) and concluded that Claimant was not disabled. [Dkt. 12-2 at 25-26.] Specifically, the ALJ found as follows:

---

[4] The relevant evidence of record is amply set forth in the parties' briefs and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

- At Step One, Claimant had not engaged in substantial gainful activity[5] since June 19, 2017, the alleged onset date.  [Dkt. 12-2 at 18.]

- At Step Two, Claimant had a "severe impairment: schizoaffective disorder."  [Dkt. 12-2 at 19 (citations omitted).]

- At Step Three, Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  [Dkt. 12-2 at 20.]

- After Step Three but before Step Four, Claimant had the RFC "to perform a full range of work at all exertional levels but with the following non[-]exertional limitations: the work should consist of simple, routine tasks."  [Dkt. 12-2 at 21.]

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Claimant's RFC, he was capable of performing his past relevant work as a courier and delivery driver.  [Dkt. 12-2 at 25.]

## III. DISCUSSION

Claimant asserts four errors, arguing that:  (1) the ALJ provided only a perfunctory analysis of whether he met Listing 12.03 and failed to utilize a medical expert to consider whether he medically equaled the listing; (2) the ALJ did not properly evaluate Claimant's statements concerning his subjective symptoms; (3) the ALJ did not explain his RFC assessment adequately; and (4) the ALJ did not address whether Claimant could have sustained full-time work with the amount of necessary treatment that he received.  The Court will address the issues in turn.

### A. Listing 12.03

To meet a listing, a claimant must establish with objective medical evidence the precise criteria that is specified.  *See* 20 C.F.R. § 404.1525; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of

---

[5] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

the criteria in the Listing in order to receive an award of" benefits at Step Three).  In the alternative, a claimant can establish "medical equivalence" in the absence of one or more of the findings if he has other findings related to the impairment or has a combination of impairments that "are at least of equal medical significance."  *See* 20 C.F.R. § 404.1526(a)-(b).  In considering whether a claimant's impairment meets or equals a listing, an ALJ must discuss the listing by name and offer more than a perfunctory analysis.  *See Minnick v. Colvin,* 775 F.3d 929, 935-36 (7th Cir. 2015).  To demonstrate that an ALJ's listing conclusion was not supported by substantial evidence, the claimant must identify evidence of record that was misstated or ignored that met or equaled the criteria.  *See*, *e.g.*, *Sims v. Barnhart*, 309 F.3d 424, 429-30 (7th Cir. 2002).  The claimant must also show that a more thorough analysis could have led to a different outcome at Step Three.  *Jeske v. Saul*, 955 F.3d 583, 589-91 (7th Cir. 2020).

Claimant contends that his schizophrenia met or "at least" equaled Listing 12.03.  [Dkt. 16 at 19.]  Listing 12.03 has "three paragraphs, designated A, B, and C; [a claimant's] mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(A)(2).  Claimant contends that the ALJ analyzed the paragraph B criteria, but he did not discuss paragraphs A and C.  [Dkt. 16 at 18.]  The ALJ's discussion of the paragraph B criteria—that would be material to the case only if the paragraph A diagnostic criterion was satisfied for Listing "12.03 *Schizophrenia spectrum and other psychotic disorders*"—as well as his finding that schizoaffective disorder[6]

---

[6] Claimant argues that the ALJ "independently changed [his] entire diagnosis" from what was consistently assessed in the record as schizophrenia to the distinct schizoaffective disorder that was never assessed by the various medical professionals in the record.  [Dkt. 16 at 21-22.]  Claimant does not explain the significance of his proper diagnosis.  The regulation explains that both diagnoses are examples of disorders that are evaluated in the Listing 12.03 category.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(B)(2)(b).  Claimant has not demonstrated that the distinction is material.

was a severe impairment, implies that he found that the paragraph A criterion of Listing 12.03 was satisfied.  [*See* Dkt. 12-2 at 20-21]; 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.03.  However, to meet or equal the listing in the manner that Claimant contends—resulting in presumptive disability—the paragraph C criteria must also be demonstrated.  Listing 12.03 requires:

> C.  Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
>> 1.  Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
>>
>> 2.  Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.03(C).

When discussing his Step Three findings, the ALJ addressed the paragraph C criteria only to explain in conclusory fashion that neither requirement 1 nor 2 was established by the record evidence.  [Dkt. 12-2 at 21.]  However, the Seventh Circuit has explained "it is proper to read the ALJ's decision as a whole, and . . . it would be needless formality to have the ALJ repeat substantially similar factual analyses" throughout the decision.  *Rice*, 384 F.3d at 370 n.5.  In a case where the ALJ did not find a severe impairment that affected Claimant's physical functioning, the ALJ predominantly discussed Claimant's mental functioning throughout the decision.

Claimant contends that the entire record documents that his schizophrenia persisted for more than two years with ongoing, intensive mental health treatment and therapy that had diminished the signs and symptoms of his disorder.  [Dkt. 16 at 20.]  Claimant develops his listing argument further by explaining only:

His therapists frequently documented his improvements when engaging in regular therapy and taking his medications. This is supported by the fact that when his insurance was dropped, through no fault of his own but an internal error, for only about a month, causing him to be unable to attend therapy and to be late getting his Abilify injection by a few weeks, he began to decompensate again. He was noted to be very tense and making a fist during the appointment. [Dkt. 12-9 at p.201, R. 1131]. He did report a return of his strange thoughts on a few occasions after being late on Abilify. [Dkt. 12-9 at p.189, R. 1119]. When he resumed his intensive treatment[,] his symptoms diminished again. He has also demonstrated difficulties adapting to changes in his environment by frequently quitting jobs after just a few days. [Dkt. 12-9 at pp.15, 229, 275, R. 945, 1159, 1205]. He reported that his anxiety is a big part of his difficulty on the job. [Dkt. 12-9 at p.275, R. 1205]. At one point he had started two different jobs in the last couple of months, but quits within days of starting. [Dkt. 12-9 at p.257, R. 1187]. [Claimant] noted an increase in anxiety while at these jobs, including increased worry and a return of repetitive behaviors such as counting and tapping his feet a particular number of times. *Id.* These symptoms resolved after quitting the job. *Id.*

[Dkt. 16 at 20-21.] Claimant does not develop with any legal authority that his summary of the record facts establishes the severity contemplated by the listing. Even medical equivalence requires that Claimant's condition be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). Claimant also does not present any medical opinion as establishing that his impairment was as severe as the listing requires.[7]

The regulation explains that "[p]sychosocial supports, structured settings, and living arrangements, including assistance from your [(a claimant's)] family or others, may help you by

---

[7] On October 17, 2019, a treating psychiatric-mental health nurse practitioner, Hillary House, assessed that Claimant had a disorder of at least two-years duration that resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment—outside a highly supportive living arrangement—would be predicted to cause him to decompensate. [Dkt. 12-10 at 87.] Nurse House is considered an acceptable medical source who is able to give a medical opinion according to the new regulatory scheme for claims—such as Claimant's here—that are filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1502(a)(7). However, the ALJ found that "[t]he medical opinion of Nurse House was not persuasive," because she did not explain her conclusions and they were inconsistent with the record, including Claimant's activities of daily living and ongoing work activity. [Dkt. 12-2 at 24.] Claimant has not challenged the ALJ's evaluation of the medical opinions, including Nurse House's.

reducing the demands made on you." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(D)(1).  The regulation also explains that treatment may reduce a claimant's symptoms and possibly improve his functioning.  Id.  The regulation gives examples of the type of highly structured settings that correspond with the listing's requirement:

a.  You receive help from family members or other people who monitor your daily activities and help you to function.  For example, family members administer your medications, remind you to eat, shop for you and pay your bills, or change their work hours so you are never home alone.

b.  You participate in a special education or vocational training program, or a psychosocial rehabilitation day treatment or community support program, where you receive training in daily living and entry-level work skills.

c.  You participate in a sheltered, supported, or transitional work program, or in a competitive employment setting with the help of a job coach or supervisor.

d.  You receive comprehensive "24/7 wrap-around" mental health services while living in a group home or transitional housing, while participating in a semi-independent living program, or while living in individual housing (for example, your own home or apartment).

e.  You live in a hospital or other institution with 24-hour care.

f.  You receive assistance from a crisis response team, social workers, or community mental health workers who help you meet your physical needs, and who may also represent you in dealings with government or community social services.

g.  You live alone and do not receive any psychosocial support(s); however, you have created a highly structured environment by eliminating all but minimally necessary contact with the world outside your living space.

Id.

At one point, on November 14, 2017, Claimant was living with his two adult sisters, who expressed concerns to his therapist about his abilities to live independently, take his medication, and to be honest.  [Dkt. 12-7 at 164.]  One sister described observing Claimant's "bizarre" behaviors at night that his therapist thought were consistent with catatonia.  [Dkt. 12-7 at 164-65.]  The sisters also described needing to assist Claimant with his financial problems, including

bankruptcy, as well as completing paperwork necessary for matters such as insurance coverage, but that their assistance was complicated by Claimant being dishonest about what he had done, for example, which bills he had paid.  [Dkt. 12-7 at 164.]  One of his sisters also reported that she believed that he had lost his most recent job because he stopped taking his medication—which often caused him to become argumentative—something he had a habit of doing in the past, but she could not determine for certain what had happened because he would not explain why he was terminated, nor was he truthful about taking his medication.  [Dkt. 12-7 at 164.]  Claimant's therapist described him as cooperative with him, but hostile toward his sisters during the session.  [Dkt. 12-7 at 165.]  His therapist observed that Claimant's pupils became dilated while he was arguing with his sisters, such that his therapist had to intervene.  [Dkt. 12-7 at 165.]  His therapist assessed that Claimant's description and previous documentation of "strange thoughts" was consistent with delusions, and his "diminished emotional expression" concerning the death of his mother—with whom he had lived previously for many years into adulthood—was consistent with "negative symptoms" typically associated with a schizophrenia diagnosis.  [Dkt. 12-7 at 165.]  Claimant's therapist concluded that he had "a very supportive family and without this level of support it is likely [he] would not be able to function independently at a level sufficient to provide for himself in regards to housing and safety."  [Dkt. 12-7 at 165.]

        During the session, Claimant admitted to stopping his medication in the past, but reported to his therapist that he was at that time taking his medication as prescribed.  [Dkt. 12-7 at 164.]  He offered to allow his sisters to inspect his pill box to verify his compliance, but he would not explain his reluctance to have his medication administered by monthly injections.  [Dkt. 12-7 at

164.] However, on November 30, 2017, Claimant received his first injection of Abilify Maintena.[8] [Dkt. 12-7 at 204.]

The ALJ explained that after Claimant started Abilify injections (along with taking Prozac orally), his "schizophrenia was controlled." [Dkt. 12-2 at 23.] Mental impairments that are controlled by medications are not a basis for disability. *See, e.g.*, *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006). On February 22, 2018, according to his therapist, Claimant was making progress by being able to describe his strange thoughts that he had not disclosed to his therapist previously (or any provider for around two years). [Dkt. 12-7 at 317-18.] His therapist assessed that Claimant's strange thoughts were "consistent with paranoid and persecutory delusions." [Dkt. 12-7 at 317.] Claimant explained how his thoughts had made it difficult to prioritize bills and paperwork, but he recognized now that there was "no truth to them." [Dkt. 12-7 at 317.] He reported "feeling much better" and he was "happy to be working." [Dkt. 12-7 at 317.]

The ALJ cited evidence that Claimant reported improvement to the point that his symptoms were controlled. [Dkt. 12-2 at 23.] The ALJ also explained with supporting citations to the record that Claimant's treating providers "continuously noted" a lack of abnormal findings during mental status examinations. [Dkt. 12-2 at 24.] On April 3, 2018, during a review of symptoms with one of his treating providers, he reported that he was "[n]egative for decreased concentration, dysphoric mood and sleep disturbance. The patient is not nervous/anxious. Schizophrenia controlled with the medicines." [Dkt. 12-7 at 24.] He reported that since he had

---

[8] Abilify Maintena is a name brand for extended-release aripiprazole, an atypical antipsychotic and antimanic used to treat schizophrenia and other psychotic disorders, that can only be administered in intramuscular injections that are given within a specific window, roughly every four weeks. Rx List, https://www.rxlist.com/abilify-maintena-drug.htm#description (last visited November 2, 2021).

been on Abilify injections, "his thought process has improved and his mood is better," specifically compared to the past disruption to his life when he had been delusional.  [Dkt. 12-7 at 22.]  He was still living with his sister but was looking to find his own accommodations, he was able to do "different chores at his sister[']s house," he was working six hours per week as a courier, he was thinking about volunteering to direct patients in the emergency room of a hospital, and he was going to the library daily to read, work on the computer, and to get organized.  [Dkt. 12-7 at 22.]  On September 13, 2018, Claimant reported to Nurse House that he was tolerating his medications without any side effects.  [Dkt. 12-10 at 42.]  Nurse House also recorded that Claimant:

> States that [his] mood remains stable.  Continues to work part time [as a courier].  Enjoys the position and states that he is keeping up with all work[-]related responsibilities.  Attends church regularly and has started a bible study.  Client has started dating.  No significant depression.  Denies prolonged depressed mood, sadness, crying, hopelessness, worthlessness, or irritability in the last couple of months.  Denies agitation and angry outbursts.  Denies [suicidal ideations], [homicidal ideations].  Appetite has been good.  No weight changes.  Making an effort to eat healthy.  Lost 2 lbs.  Energy and motivation have been good.  Living with sister . . . right now.  States that his thoughts remain clear and organized.  Very minimal "strange thoughts" in the last several months.  Reports feeling in control of his thoughts since being on Ability.  Eye contact good.  Tending to hygiene.  Sleeping well.  No [auditory hallucinations] or [visual hallucinations] reported.  No reports of paranoia.  Worry and nervousness persists but identifies symptoms as manageable.  Denies panic attacks.  Reports very occasional repetitive behaviors[] ([i.e.] repeating steps several times when engaging in activities like running errands or making food).  States that this is not a regular occurrence, and when obsessive/[compulsive] tendencies come up, client finds that symptoms are much more manageable.  No hypomania, mania.

[Dkt. 12-10 at 42.]  Claimant's mental status examination recorded that he was "[i]n no acute distress," he had appropriate hygiene and grooming, he had no psychomotor agitation, retardation, no abnormal involuntary movements, his mood was "good," his affect was "near euthymic," his thoughts were "clear, logical, and sequential," he denied delusions, he was alert and oriented, and his judgment, insight, and impulse control were all "good."  [Dkt. 12-10 at 42.]

12

There is substantial evidence that Claimant's schizophrenia improved significantly and was controlled with Abilify injections.

Except for the support that Claimant needed from his family prior to starting the injections, Claimant presents little evidence that he required the kind of intensive, comprehensive treatment or structured support that is described in the regulatory examples as meeting the Listing 12.03(C)(1) requirement.  On December 3, 2018, Claimant attended one appointment to discuss a sheltered employment program offered by his treating provider.  [Dkt. 12-9 at 229.] However, he was starting a part-time job the next day and did not want his employer to know about his disability.  [Dkt. 12-9 at 229.]  He was offered outside support services by the provider. [Dkt. 12-9 at 229.]  He was also referred to vocational rehabilitation through the state.  [Dkt. 12-9 at 229.]  However, there is no evidence that he continued to receive sheltered employment services or that he participated in vocational rehabilitation.  The mere fact that he continued to live with his sister, [Dkt. 12-2 at 36], does not demonstrate that he was reliant on a highly structured setting.

The record also does not demonstrate, in the alternative, that Claimant structured his life to eliminate all but minimally necessary contact with the world outside his living space. Claimant started a bible study, he was dating, and able to run errands.  As the ALJ explained, Claimant continued to work with several part-time jobs throughout the period at issue, he was working two jobs at the time of the hearing, reportedly about 12-15 hours per week, and he did have contact with the public.  [Dkt. 12-2 at 22.]  Claimant testified that his courier job, delivering interoffice memos to clients such as real estate offices, [Dkt. 12-2 at 39], required interaction with coworkers and the public, [Dkt. 12-2 at 41].

Moreover, Claimant's examples of his marginal ability to adjust to changes and propensity for decompensation are overstated and lack proper context, particularly after he started Abilify injections.  There is no doubt that Claimant's improved functioning was reliant on him taking his prescribed medications.  However, Claimant does not present any legal authority that his limited ability to function without prescribed medications demonstrates the "marginal adjustment" Listing 12.03(C)(2) requirement.  He also cites that he quit several jobs and reportedly experienced increased anxiety as demonstrating marginal adjustment.  On November 13, 2018, Claimant followed his sisters' recommendation to reschedule his appointment sooner with Nurse House because he had recently quit two jobs within days of starting them.  [Dkt. 12-9 at 257.]  Claimant reported "a slight uptick in anxiety while at these jobs including increased worry and a return of repetitive behaviors such as counting and tapping his feet a particular number of times," which resolved after quitting the jobs.  [Dkt. 12-9 at 257.]  However, Claimant described both jobs as "much more" physically demanding than he was used to and one "required long hours, sometimes up to 11 hours a day."  [Dkt. 12-9 at 257.]  He stated that was the reason he left the job(s).  [Dkt. 12-9 at 257.]  He continued to work "very part time" as a courier.  [Dkt. 12-9 at 257.]  He also continued to report the absence of any other symptoms except "[v]ery minimal 'strange thoughts' in the last several months.  [He] [r]eports feeling in control of his thoughts since being on Abilify."  [Dkt. 12-9 at 257.]

On February 5, 2019, Claimant reported late for his injection because his insurance coverage had lapsed for a month over confusion if he was eligible for Medicare.  [Dkt. 12-9 at 201.]  He was also preoccupied with the fact that his therapist had left the provider and he would need to start individual and group therapy with someone new.  [Dkt. 12-9 at 201.]  Claimant was

anxious but was described as "always . . . very tense" when receiving his injection.  [Dkt. 12-9 at 201.]

On February 12, 2019, Claimant reported to Nurse House that his strange thoughts had returned on a few occasions after being late on his injection.  [Dkt. 12-9 at 189.]  However, his thoughts did not include suicidal or homicidal ideations and he continued to report that he knew they were not real.  [Dkt. 12-9 at 189.]  He reported things were "going well," he was working two jobs and "[j]uggling all responsibilities," his mood was "pretty good," his anxiety was "manageable," and he denied any other symptoms including "obsessive thinking or compulsive behaviors."  [Dkt. 12-9 at 189.]  His mental status examination remained free of any abnormal findings, his affect was "near euthymic" and his mood, judgment, insight, and impulse control were all "good."  [Dkt. 12-9 at 189.]

On June 26, 2019, Claimant reported to his therapist that he was working three part-time jobs.  [Dkt. 12-9 at 62.]  He was "[l]ooking to increase his hours to be able to be more independent and hopefull[y] live on his own."  [Dkt. 12-9 at 62.]  He was still dating the same woman that he started seeing early that spring.  [Dkt. 12-9 at 62.]  On September 9, 2019, he had "mixed feelings" about his disability application but did not think he could work full time "right now."  [Dkt. 12-9 at 14.]  He did not want to think that he could have "bad times" again like he did in the past.  [Dkt. 12-9 at 14.]  Claimant reported that he told his girlfriend about his mental health diagnosis and she "took it well."  [Dkt. 12-9 at 14.]  He reported that "he continues to do well with 2 part-time jobs—as well as helping his sister and brother[-]in[-]law—cleaning their home and businesses.  He continues to live with his sister and [was] getting along well."  [Dkt. 12-9 at 14.]  He was "active with his church—attends men's group, engages in volunteer work."  [Dkt. 12-9 at 14.]  Claimant reported going to concerts.  [Dkt. 12-9 at 14.]  He reported that he

and his girlfriend "play tennis, ride bikes, boat and get together with friends."  [Dkt. 12-9 at 14.]
He reported that his mood was "stable," and even though he experienced "low mood, anxiety in
response to life stress," he was "learning to manage this through treatment."  [Dkt. 12-9 at 14.]
He denied psychotic symptoms.  [Dkt. 12-9 at 14.]  He said his family continued "to be his
primary support," but he was "friendly with church family," and he was looking to make new
friends through the men's group.  [Dkt. 12-9 at 14.]  Accordingly, the ALJ's Listing 12.03(C)
conclusions are supported by substantial evidence that the record does not demonstrate either: (1)
intensive treatment or a highly structured setting, or (2) marginal adjustment.

Claimant contends that the ALJ "is in no position to make such medical determinations."
[Dkt. 16 at 19.]  Claimant also contends that the ALJ presented only a skewed version of the
evidence.  [Dkt. 16 at 21.]  Claimant contends further that the ALJ erred by not seeking an
updated opinion from a medical expert after receiving additional evidence that could have
affected the state agency psychological consultants' assessments that a listing was not met or
equaled.  [Dkt. 16 at 21-22.]

At the initial and reconsideration phases, the state agency psychological consultants
assessed that Claimant did not have a severe mental impairment, he had at most mild limitations
in the functional domains, and the evidence did not establish the criteria of any listing including
Listing 12.03(C) specifically.  [Dkt. 12-3 at 19-21; Dkt. 12-3 at 33-35.]  The ALJ concluded that
Claimant had moderate limitations with his ability to adapt or manage himself, based on his
relevant asserted difficulties, but the ALJ explained that the objective evidence did not show
those problems.  [Dkt. 12-2 at 21.]  As such, the ALJ credited that Claimant had some difficulties
adapting to changes, but the ALJ did not find them to support listing-level severity.

Claimant does not identify the evidence that he contends should have prompted the ALJ to seek the opinion of a medical expert at the hearing level. Claimant also relies on Social Security Ruling ("SSR") 96-6p to support his argument that the ALJ erred by failing to get another opinion. [Dkt. 16 at 21.] As the Commissioner points out, SSR 17-2, effective March 27, 2017, rescinded and replaced SSR 96-6p. [Dkt. 17 at 10]; SSR 17-2P (S.S.A. Mar. 27, 2017), 2017 WL 3928306, at *1. SSR 17-2, explains:

> At the hearings level of the administrative review process, administrative law judges (ALJ) . . . determine whether an individual's impairment(s) meets or medically equals a listing at step 3 of the sequential evaluation process. To assist in evaluating this issue, adjudicators at the hearings level may ask for and consider evidence from medical experts (ME) about the individual's impairment(s), such as the nature and severity of the impairment(s).

2017 WL 3928306, at *3. The ruling explains further:

> If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain ME evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment.

*Id.* at *4. Claimant does not present any argument, including in his reply brief, about the applicability or application of SSR 17-2p in this case. Accordingly, the Court does not find that the ALJ erred by declining to call a medical expert at the hearing level.

Moreover, the Seventh Circuit has repeatedly explained that "[t]he ALJ is not required to mention every piece of evidence but must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled, so that 'as a reviewing court, we may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review.'" *See, e.g.*, *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Young v. Barnhart,* 362 F.3d 995, 1002 (7th Cir. 2004)). Regarding Claimant's argument that the ALJ cherrypicked the evidence, assuming that Claimant refers to the evidence he cited above—his

reports to his providers that he had quit two jobs, he had a slight increase in anxiety associated with them, and he also had some brief, but manageable reoccurrences of strange thoughts and obsessive tendencies related to being late getting his Abilify shot—the ALJ credited some limitations with adaption and provided a logical bridge to his conclusions from the evidence of Claimant's symptoms being controlled.  Claimant has not identified any other evidence that was overlooked or ignored by the ALJ.  Accordingly, Claimant's arguments are unavailing, and he has not demonstrated the need to remand for further consideration at Step Three.

### B.  Subjective Symptoms Evaluation

Claimant contends that the ALJ erred in applying SSR 16-3p to evaluate his subjective symptoms.  [Dkt. 16 at 23.]  When evaluating a claimant's subjective statements about the intensity and persistence of his symptoms, the ALJ must often, as here, make a credibility determination concerning the limiting effects of those symptoms.  *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).  Reviewing courts "may disturb the ALJ's credibility finding only if it is 'patently wrong.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015)).  Reviewing courts examine whether a credibility determination was reasoned and supported; only when an ALJ's decision "lacks any explanation or support . . . will [a court] declare it to be 'patently wrong.'" *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).  "Credibility determinations will not be overturned unless they are clearly incorrect. As long as the ALJ's decision is supported by substantial and convincing evidence, it deserves this court's deference." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citations omitted); *see Alvarado v. Colvin*, 836 F.3d 744, 749 (7th Cir. 2016) (A credibility determination "tied to evidence in the record" may not be disturbed as patently wrong.).  If a fully favorable determination cannot be made based solely on the objective medical

evidence, SSR 16-3p directs the ALJ to consider "all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms," including the regulatory factors relevant to a claimant's symptoms, such as daily activities, the location, duration, frequency, and intensity of pain or other symptoms, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; and treatment, other than medication, an individual receives or has received for relief of pain or other symptoms.  SSR 16-3p (S.S.A Oct. 25, 2017), 2017 WL 5180304, at *6-8; 20 C.F.R. § 404.1529(c)(3).

Claimant makes limited arguments that the ALJ erred, arguing that the ALJ impermissibly relied on his part-time work activity and activities of daily living to conclude that Claimant was capable of working full time.  [Dkt. 16 at 24-26.]  Claimant also cites the conclusion of his therapist, discussed in the previous section, that he was reliant on his family and unable to function independently regarding his housing and safety.  [Dkt. 16 at 25.]

However, Claimant does not engage many of the ALJ's reasons for discrediting the severity of his symptoms.  As discussed in the previous section, the ALJ relied on evidence that Abilify injections controlled Claimant's symptoms, he reported minimal symptoms after starting the medication, he reported being much more active and involved with the community, and his treating providers did not record many, if any, abnormalities on mental status examinations after starting the monthly injections.  The ALJ may consider inconsistencies between the severity of symptoms that the claimant described to the SSA and the claimant's reported symptoms while seeking treatment, the level of treatment, and the effectiveness of treatment.  *See e.g.*, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005); *see also Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (noting the deference given to the administrative factfinder on

19

judicial review, as well as the regulatory guidance instructing the ALJ to consider such evidence).  As described above, the ALJ cited to the record to support his relevant considerations.

The ALJ also discussed Claimant's continuous, ongoing part-time work activity.  [Dkt. 12-2 at 22.]  The Seventh Circuit has "cautioned ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment." *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017) (citing *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (explaining that a claimant's "brief, part-time employment" did not support the conclusion "that [he] was able to work a full-time job, week in and week out, given [his] limitations"); *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) ("There is a significant difference between being able to work a few hours a week and having the capacity to work full time.").  In *Lanigan*, the court explained "[t]hat is especially true when . . . the claimant's employer is accommodating him." 865 F.3d at 565 (citing *Larson*, 615 F.3d at 752).  Here, the evidence showed that Claimant did not want his employer to know about his disability and there is no evidence that he received any kind of regular outside support with his employment.  The ALJ acknowledged that Claimant asserted his impairments precluded him from working full time.  [Dkt. 12-2 at 22.]  However, Claimant also testified that he thought he could do his courier job full time.  [Dkt. 12-2 at 43.]  He reported to his treating provider that he wanted to increase his hours as he worked towards further independence.  When the ALJ asked Claimant if he had any issues working around people that he did not know, he testified, "Not so much.  I'm pretty friendly, I'm pretty good with names.  So, not so much . . . ."  [Dkt. 12-2 at 41.]

Claimant cites his own reports that he was overwhelmed with his last full-time employment in 2017, his belief that he could not work full time because his strange thoughts

impaired his ability to concentrate, and evidence that he quit two jobs within a few days in June 2018.  [Dkt. 16 at 25.]  However, his experience before beginning Abilify injections does not necessarily imply he could not sustain employment during the period at issue.  He reported almost no strange thoughts after starting injections.  He also had greater insight into his thoughts. There was no objective evidence of impaired concentration.  Claimant had specific issues with the particular jobs that he started, but those issues were not necessarily related to his mental impairments, and he was able to maintain two other part-time jobs.

The Seventh Circuit has "criticized ALJs for equating activities of daily living with an ability to work." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (citations omitted). However, an ALJ is not only permitted but instructed to consider daily activities.  *Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)).  The ALJ may properly use activities of daily living to demonstrate that the claimant's testimony was undermined about the extent of his limitations.  *Loveless*, 810 F.3d at 508; *Pepper v. Colvin,* 712 F.3d 351, 369 (7th Cir. 2013).  Here, as discussed above, Claimant reported the ability to engage in a wide array of activities, such as helping his siblings with chores, working, volunteering, participating in a men's group at church, dating, doing activities with his girlfriend and friends, running errands, driving, taking public transportation, cooking, going to the library, reading, and using a computer.  [*See* Dkt. 12-2 at 23 (ALJ's relevant discussion).]  Considering the nature of Claimant's allegations that he was completely disabled as result of his mental impairments, the ALJ use of the record to support that Claimant was capable of simple, routine tasks, as well as the ALJ's associated credibility evaluation was not patently wrong.

### C.  RFC Finding

Claimant contends that the ALJ did not explain his RFC conclusions adequately.  [Dkt.
16 at 28.]  Claimant also contends that the ALJ did not address his reactions to stress.  *Id.*  SSR
85-15 cautions that reactions to the demands of work (or stress) are highly individualized,
whereby a particular individual may find performance of so called low-stress or unskilled work
to be as objectively difficult as more complex or stressful work based on their particular mental
impairments.  SSR 85-15 (S.S.A. 1985), 1985 WL 56857 at *5-6.  However, the ruling makes
clear that its examples are "not intended to set out any presumptive limitations for disorders, but
to emphasize the importance of thoroughness in evaluation on an individualized basis."  *Id.* at *5.
Moreover, the context of the ruling's guidance is that "[i]n the world of work, losses of
intellectual and emotional capacities are generally more serious when the job is complex."  *Id.* at
*4.

The ALJ explained that he limited Claimant to simple and routine tasks to account for his
moderate limitations with his ability to adapt or manage himself.  [Dkt. 12-2 at 25.]  The ALJ
also explained that Claimant had not reported any difficulties with his job duties as a courier,
including his necessary interaction with others.  [Dkt. 12-2 at 22.]  Claimant was only working
part time as a courier during the period at issue, but he had previously performed the job full
time such that the occupation met the requirements to be considered past relevant work.  [*See*
Dkt. 12-2 at 25.]  As such, the ALJ provided a logical bridge to his RFC conclusion that
Claimant was not limited with interpersonal interaction, as well as his Step Four determination
that Claimant would be capable of performing his past relevant work.

In support of his argument, Claimant cites only his own reports that life stress caused him
to experience low mood and anxiety and his testimony that working too many hours increased

his anxiety and caused his movements to be off.  [Dkt. 16 at 28.]  Claimant reported to Nurse

House that he had "low mood, anxiety in response to life stress," but he was "learning to manage

this through treatment."  [Dkt. 12-9 at 14.]  He also testified that he got overwhelmed with too

many hours, causing him to take "funny steps" when he had increased anxiety.  [Dkt. 12-2 at 43-

44.]  Claimant testified that his reaction "would depend on the job."  [Dkt. 12-2 at 43.]  He also

testified that even when he was experiencing high anxiety, he thought he was able to concentrate

on his job "[m]ost of the time," and he was able to work "maybe not as quickly, but pretty timely,

pretty close" to as quickly as his coworkers who did the same courier job.  [Dkt. 12-2 at 44.]

Claimant does not identify any specific limitations that he contends the record supported

that were omitted from his RFC.  The appellant must establish harm by developing specific

limitations that were supported and neglected.  *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th

Cir. 2019).  Accordingly, Claimant has not demonstrated the need for remand for further

discussion of his RFC.

### D.  Ability to Sustain Work

Claimant also contends that the ALJ failed to acknowledge that a claimant must be able

to keep a job.  [Dkt. 16 at 31.]  He contends further that the ALJ did not address the evidence that

he had lost his last full-time job because of his mental impairments, and he needed to attend

regular treatment for those impairments.  [Dkt. 16 at 31-33.]

As discussed previously, Claimant's sister believed that he lost his last full-time job

because he stopped taking his medication.  Claimant's treating provider started him on monthly

injections because of the reported history of his noncompliance with taking antipsychotic

medication.  Evidence that Claimant once potentially lost his job related to his mental symptoms

does not necessarily conflict with the ALJ's determination that Claimant's symptoms were

controlled with the injections.  Accordingly, the ALJ did not err by failing to discuss the evidence.

Concerning Claimant's ability to sustain work while undergoing necessary treatment, the VE testified that for unskilled work such as Claimant's past relevant work, "most employers will tolerate two absences during a month," but "should that continue on an ongoing basis, competitive employment would be precluded."  [Dkt. 12-2 at 49.]  The VE also testified that instances of coming in late or leaving early were considered full-day absences.  [Dkt. 12-2 at 49.]

In *Gary B. v. Berryhill*, 2018 WL 4907495, at *3-4 (S.D. Ind. Oct. 10, 2018) (collecting cases and administrative authority), the court explained that the Seventh Circuit has never directly addressed an ALJ's articulation requirements concerning a claimant's ability to sustain work while receiving medical treatment, but considering the authorities:

> Taken together, an ALJ may be obligated to address a claimant's ability to sustain work, if the claimant presents sufficient evidence demonstrating that the ability would be precluded by treatment visits which are necessitated by the claimant's impairments.  Necessary visits may preclude sustaining work if they are too frequent or otherwise cannot be scheduled around a full-time competitive work schedule, including if those visits regularly occur on an emergency or otherwise unpredictable basis.

Concerning the claimant in that case, the court also explained that:

> He receives rather standard treatment with a psychiatrist every few months and weekly therapy.  The frequency of those visits does not appear to be work preclusive, nor is there evidence that the length of those visits would make it difficult to schedule them around a full-time work schedule.  He has not presented any evidence that the providers are inflexible about when the visits must occur.

*Id*. at *5.

Claimant submitted an exhibit listing all his relevant treatment visits during the period at issue that shows he attended weekly group therapy, individual therapy roughly monthly, medication management at first monthly and later every two months, and he received injections

every four weeks.  [Dkt 16-1.]  At one point, early on during the period at issue—around the time that Claimant started receiving injections in November 2017—he had three individual therapy sessions that month, but later, in the last 12 months of the record, he attended only 10 individual therapy sessions.  Group therapy sessions were offered on different weekdays and times including evenings.  [*See, e.g.*, Dkt. 12-7 at 64 (Tuesday, June 28, 2017 at 6:30pm); Dkt. 12-9 at 163 (Tuesday, March 12, 2019 at 11am); Dkt. 12-9 at 55 (Thursday, July 11, 2019 at 10:30am); Dkt. 12-9 at 40 (Tuesday, August 20, 2019 at 5:30pm).]  In addition to medication management being every two months towards the end of the record, those visits appear to be brief.  [*See* Dkt. 12-8 at 22 (medication management, Thursday, April 19, 2018 at 2pm), *compared with* Dkt. 12-8 at 32 (Abilify injection, same day at 2:30pm).]  Similarly, his appointments to receive injections appear brief.  [*See* Dkt. 12-9 at 216 (Abilify injection, December 18, 2018 at 3:45pm), *compared with* Dkt. 12-9 at 211 (individual therapy, same day at 4pm).]

In *Karen A. R. v. Saul*, 2019 WL 3369283, at *4 (S.D. Ind. July 26, 2019), the court explained that a list of visits—showing one to four a month with all visits lasting under an hour —did not provide enough evidence to demonstrate that the claimant could not sustain full-time work.  Here, there was one day, December 18, 2018, that Claimant attended four appointments (all four of his various types of regular appointments).  [Dkt. 12-9 at 211-24.]  However, there is no explanation in the record as to the circumstances, *i.e.* whether the scheduling was for the Claimant's convenience.  He only attended five appointments total in December 2018.  [*See* Dkt. 12-9 at 229 (one visit on December 3, 2018).]  There were examples of Claimant attending three or four appointments on the same day—though that was not a regular occurrence—but the ability to schedule all his various appointments on the same day could make managing a full-time work

schedule with necessary treatment easier rather than more difficult if the provider allowed him

the flexibility to stack appointments on his days off work. The record simply does not provide

enough information for the Court to conclude that Claimant could not sustain work with his

necessary level of treatment. The Seventh Circuit has held that "[w]hen an applicant for social

security benefits is represented by counsel the administrative law judge is entitled to assume that

the applicant is making his strongest case for benefits." *Glenn v. Sec'y of Health & Human

Servs.*, 814 F.2d 387, 391 (7th Cir. 1987); *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir.

2017). Claimant has not demonstrated that his treatment visits precluded his ability to sustain

full-time work.

## IV. CONCLUSION

The Court can find no legal basis presented by Claimant to reverse the ALJ's decision

that he was not disabled during the relevant time period. Therefore, the decision below is

**AFFIRMED**. Final judgment will issue accordingly.

SO ORDERED.


Dated:  18 NOV 2021

_____

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana


Distribution:

Service will be made electronically
on all ECF-registered counsel of record
via email generated by the Court's ECF system.